IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

GRATTON CURTIS ODELL,

    **Plaintiff,**

    v.                                                               CASE NO. 25-3008-JWL

FORD COUNTY SHERIFF'S DEPARTMENT, et al.,

    **Defendants.**

**MEMORANDUM AND ORDER**

Plaintiff Gratton Curtis Odell, a state prisoner appearing pro se and in forma pauperis, filed this civil rights complaint pursuant to 42 U.S.C. § 1983. As the sole Count in this matter, Plaintiff alleges that Defendants Bryan Stammer, Matthew Bolmer, and Stephen M. Ligon, all of whom are officers of Defendant Ford County Sheriff's Department (FCSD), used unconstitutional excessive force on him during his arrest in January 2023 by tasing him 23 times.

On January 16, 2025, the Court issued a memorandum and order (M&O) finding that the proper processing of Plaintiff's claims could not be achieved without additional information from appropriate officials of the FCSD. (Doc. 4 (citing *Martinez v. Aaron*, 570 F.2d 317 (10th Cir. 1978), and *Hall v. Bellmon*, 935 F.2d 1106 (10th Cir. 1991)). The Court therefore ordered FCSD officials to prepare and file a *Martinez* Report, stating that "[o]nce the report has been received, the Court can properly screen Plaintiff's claims under 28 U.S.C. § 1915A." (Doc. 4, p. 7.) The *Martinez* Report (Doc. 10), hereinafter referred to as "the Report," has now been filed, and Plaintiff's complaint is before the Court for screening in light of the Report. The Court's screening standards are set forth in detail in the January 16, 2025 M&O. (Doc. 4, p. 2-4.)

1

## I.  Nature of the Matter before the Court

Plaintiff alleges in the complaint that at the time of the relevant events, he and his girlfriend were having problems. (Doc. 1, p. 2.) On the night of January 27, 2023, his girlfriend reported to local law enforcement that he had stolen their pickup truck and, when police did not respond, the next morning she reported him for domestic violence. *Id.* at 2, 4-5. Officer Morris Jones of the FCSD responded to the call and came to Plaintiff's home before Plaintiff left for work on the morning of January 28, 2023. *Id.* at 4. While Plaintiff and Officer Jones were talking, three additional FCSD officers arrived in response to the call: Defendants Stammer, Bolmer, and Ligon. *Id.* The three newly arrived officers "took control of the conversation" and "were all asking [questions] and talking at the same time." *Id.* at 4-5.

Plaintiff alleges that he attempted to explain the circumstances that led to his girlfriend contacting police that morning and the night before, but the officers "tried to tell [him] what happened and what [he] did and that [he] had hurt" his girlfriend. *Id.* at 6. Plaintiff told the officers that he may have shoved his girlfriend and that he had broken a phone he had given her as a gift. *Id.* At that point, officers told Plaintiff he was under arrest. *Id.* Plaintiff told the officers to go talk to his girlfriend again. *Id.*

Plaintiff alleges that the officers then began to manhandle him and one of them tackled him, after which they tased Plaintiff. *Id.* Plaintiff believes Officers Stammer and Bolmer were most involved, but he alleges that Officer Ligon's wife later apologized for her husband's involvement as well. *Id.* Plaintiff was tased 23 times in his right leg and right arm and was taken to jail. *Id.* at 6-7. He did not receive medical attention, despite feeling chest pain and shortness of breath while being transported, and he showed his injuries to another inmate once at the jail. *Id.* at 7. After Plaintiff posted bond and was released, he went to St. Catherine's Hospital in Dodge City, Kansas,

where staff counted 48 marks on his body from the taser. *Id.* Plaintiff also was referred to speak to a counselor in Dodge City who prescribed medication "for the incident" and for post-traumatic stress disorder. *Id.*

Plaintiff names as defendants the FCSD, Officer Stammer, Officer Bolmer, and Officer Ligon. *Id.* at 1-3. As the sole Count in this matter, Plaintiff alleges that tasing him 23 times was an unconstitutional use of excessive force. *Id.* at 4. As relief, Plaintiff seeks reversal of his subsequent criminal convictions, the award of compensatory damages, and reimbursement of his hospital bill.

## II. The *Martinez* Report

The Report acknowledges that the arrest occurred, that force was used during the arrest, and that Defendant Bolmer used his taser on Plaintiff multiple times during the arrest. (Doc. 10, p. 4-8.) Specifically, the Report alleges that early in the morning on January 28, 2023, FCSD Deputy Luiz Marquez responded to a report that Plaintiff had committed domestic violence. *Id.* at 3; Exhibit 16. Plaintiff was not present at the home of the victim, but FCSD Master Deputy Jones located him walking along a road, purportedly on his way to work. *Id.* at 3. Defendants Stammer, Bolmer, and Ligon arrived at the scene and Defendant Stammer asked Plaintiff what had happened with the victim that morning. *Id.* Plaintiff admitted shoving the victim and breaking her phone. *Id.*

Deputy Marquez approached Plaintiff and instructed him to put his hands behind his back. *Id.* Plaintiff pulled away and resisted Deputy Marquez' and Defendant Stammer's efforts to place him into handcuffs; he held his hands in front of him or to the side instead of complying with Defendant Stammer's repeated commands to "give me your hands." *Id.* at 4. At some point as Plaintiff struggled with the law enforcement officers, he kicked Defendant Ligon's hand. *Id.* at 4.

Defendant Bolmer warned Plaintiff at least three times to stop resisting or "'you're gonna [*sic*] be tased,'" but Plaintiff continued to resist. *Id.* Deputy Bolmer then "applied the taser in drive

3

stun mode," which "mean[s] no projectiles were ejected and no probes were embedded into" Plaintiff. *Id.* at 4, 10. Deputy Bolmer applied the taser to Plaintiff at his "right thigh just above his knee," but Plaintiff "rotated his body to the right to avoid the [t]aser and the [t]aser was unable to make good contact." *Id.* at 4-5. Plaintiff continued to resist commands and efforts to arrest him. *Id.* at 5.

The deputies then "took [Plaintiff] to the ground" and struggled with him in an attempt to place handcuffs on him; Plaintiff "tucked both arms under his body and kicked at" them. *Id.* Defendant Stammer continued to yell "Give me your hands" and put pressure on a pressure point behind Plaintiff's right ear. *Id.* at 5-6. Because Plaintiff kept resisting, Defendant Bolmer applied the taser, still in drive stun mode, "to the back of Plaintiff's thigh once, and to the back of his left thigh four times; each application of the taser lasted approximately 2 seconds or less . . . due to [Plaintiff's] continued resistance and attempt to roll away from the officers. [*sic*]" *Id.* at 6. When Deputy Jones and Defendant Stammer gained control of Plaintiff's hands, Defendant Bolmer holstered his taser. *Id.* at 8. Plaintiff "continued to fight and kick" while he was searched, and Defendant Ligon held Plaintiff's legs down "so [Plaintiff] could not kick the deputies." *Id.*

Plaintiff was placed into the front passenger's seat of Defendant Bolmer's patrol vehicle and Defendant Bolmer began to drive him to the Ford County Jail. *Id.* Plaintiff said that he could not breathe and that he was claustrophobic, so Defendant Bolmer rolled down the front passenger window to allow fresh air into the vehicle. *Id.* at 9. While the vehicle was moving, Plaintiff undid his seat belt and jumped out of the window, still handcuffed. *Id.* Defendant Bolmer also left the still-moving vehicle and recaptured Plaintiff at the side of the road. *Id.* at 9. The other officers arrived shortly thereafter and again had to physically restrain Plaintiff. *Id.* Eventually, at Defendant Stammer's request, Dodge City police officers arrived and took Plaintiff to the jail in a caged

4

vehicle. *Id.* at 9-10. Jail staff placed Plaintiff into a restraint chair and took him into their custody. *Id.* at 10.

Plaintiff was charged with and eventually pled no contest to felony aggravated domestic battery; aggravated escape, also a felony; felony interference with law enforcement for "'unlawfully and knowingly obstruct[ing], resist[ing] or oppos[ing] . . . Deputy Marquez'"; and misdemeanor battery on a law enforcement officer for kicking Defendant Ligon. *Id.* at 10-11. He was sentenced to 46 months in prison, a concurrent sentence of 12 months in county jail, and 12 months of postrelease supervision. (Doc. 10, p. 11; Doc. 10-12).

## III. Discussion

### A. Excessive Force

"Excessive force claims are cognizable under the Fourth, Fifth, Eighth, and Fourteenth Amendment, depending on where in the criminal justice system the plaintiff is at the time of the challenged use of force." *Vette v. K-9 Unit Deputy Sanders*, 989 F.3d 1154, 1169 (10th Cir. 2021) (citation omitted). "When an 'excessive force claim arises in the context of an arrest or investigatory stop of a free citizen, it is most properly characterized as one invoking the protections of the Fourth Amendment.'" *Id*. (quoting *Graham v. Connor*, 490 U.S. 386, 394 (1989)).

"To state an excessive force claim under the Fourth Amendment, plaintiffs must show *both* that a seizure occurred and that the seizure was unreasonable." *Id.* (quoting *Bond v. City of Tahlequah*, 981 F.3d 808, 815 (10th Cir. 2020) (emphasis in original) (quotation marks omitted)). In assessing reasonableness, a court "looks at the facts and circumstances as they existed at the moment the force was used, while also taking into consideration the events leading up to that moment." *Id*. (quoting *Emmett v. Armstrong*, 973 F.3d 1127, 1135 (10th Cir. 2020)). The inquiry is an objective one, and one that considers the totality of the circumstances. *Id*. (citation omitted).

Reasonableness is "judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* (quoting *Graham*, 490 U.S. at 396). "The right to make an arrest . . . necessarily carries with it the right to use some degree of physical coercion . . . to effect it." *Edwards v. City of Muskogee, Oklahoma*, 841 F. App'x 79, 83 (10th Cir. 2021) (unpublished) (quoting *Lundstrom v. Romero*, 616 F.3d 1108, 1126 (10th Cir. 2010) (internal quotation marks omitted)). "Reasonableness does not require that officers use alternative or less intrusive means if the conduct is otherwise reasonable." *Arnold v. City of Olathe, Kansas*, Case No. 2:18-cv-02703-HLT, 2021 WL 3129408, at *8 (D. Kan. July 23, 2021) (citation omitted).

The Supreme Court in *Graham* outlined three factors that guide the reasonableness analysis: (1) "the severity of the crime at issue," (2) "whether the suspect poses an immediate threat to the safety of the officers or others," and (3) "whether he is actively resisting arrest or attempting to evade arrest by flight." *Vette*, 989 F.3d at 1169 (quoting *Graham*, 490 U.S. at 396). In evaluating the third factor, a court considers "whether the plaintiff was fleeing or actively resisting at the 'precise moment' the officer employed the challenged use of force." *Id.* (citation omitted). The Tenth Circuit has also held that "initial resistance does not justify the continuation of force once the resistance ceases." *McCoy v. Meyers*, 887 F.3d 1034, 1051 (10th Cir. 2018) (citations omitted).

The Court has carefully reviewed the Report and the attachments thereto, including viewing the body camera videos submitted as exhibits to the Report. The *Martinez* Report developed as a means "to ascertain whether there is a factual as well as a legal basis for [a] prisoner's claims." *Gee v. Estes*, 829 F.2d 1005, 1007 (10th Cir. 1987). It "is treated like an affidavit, and the court is not authorized to accept the factual findings of the prison investigation when the plaintiff has presented conflicting evidence." *Hall v. Bellmon*, 935 F.2d 1106, 1111 (10th

Cir. 1991) (citing *Sampley v. Ruettgers*, 704 F.2d 491, 493 n.3 (10th Cir. 1983)). Thus, at this point in the proceedings, the Court does not use the Report to resolve conflicts of fact. *See Swoboda v. Duback*, 922 F.2d 286, 290 (10th Cir. 1993) ("In determining whether a plaintiff has stated a claim, the district court may not look to the Martinez report, or any other pleading outside the complaint itself, to refute facts specifically pled by a plaintiff, or to resolve factual disputes."). However, the Tenth Circuit has held that "[w]here the video evidence blatantly contradicts a material fact allegation, we may disregard that allegation in favor of what is actually depicted on the video." *Blake v. Wallace*, 2024 WL 5087805, at *2 (10th Cir. Dec. 12, 2024) (unpublished) (citation omitted).

The body camera footage submitted with the Report blatantly contradicts Plaintiff's allegation that he was tased 23 times during his arrest. Thus, in light of *Blake*, the Court will disregard that allegation. Moreover, the Report clarifies that Defendant Bolmer was the only Defendant to use his taser during the events in question.

With regard to the *Graham* factors, the Court finds that the Report and exhibits show that the crime at issue was aggravated domestic battery and that Plaintiff was actively resisting arrest at the time the taser was used on him. Once Deputy Jones and Defendant Stammer gained control of Plaintiff's hands, Defendant Bolmer holstered his taser and did not use it again. In other words, Plaintiff was actively resisting arrest at the precise moment of the now-challenged use of force and the force ceased once the resistance ceased. Nothing in the Report or the body camera footage shows that Plaintiff was tased at any point thereafter. Thus, Plaintiff's excessive force claim appears subject to dismissal for failure to state a plausible claim on which relief can be granted. The Court will, however, grant Plaintiff the opportunity to respond to the Report and to show good cause why this matter should not be dismissed for failure to state a claim.

### B. Heck Bar

As noted above, Plaintiff pled no contest to felony aggravated domestic battery; felony aggravated escape; felony interference with law enforcement for "'unlawfully and knowingly obstruct[ing], resist[ing] or oppos[ing] . . . Deputy Marquez'"; and misdemeanor battery on a law enforcement officer for kicking Defendant Ligon. (Doc. 10-12.) *Id.* at 10-11. He was sentenced to a controlling sentence of 46 months in prison and 12 months of postrelease supervision. *Id.* The Court noted in the M&O:

> If Plaintiff's claim in this case would necessarily imply the invalidity of one or more of his convictions, the claim may be barred by *Heck*. *See Heck v. Humphrey*, 512 U.S. 477 (1994).
>
> In *Heck v. Humphrey*, the United States Supreme Court held that when a state prisoner seeks damages in a § 1983 action, the district court must consider the following:
>
>> whether a judgment in favor of the plaintiff would necessarily imply the invalidity of his conviction or sentence; if it would, the complaint must be dismissed unless the plaintiff can demonstrate that the conviction or sentence has already been invalidated.
>
> *Id*. at 487. In *Heck*, the Supreme Court held that a § 1983 damages claim that necessarily implicates the validity of the plaintiff's conviction or sentence is not cognizable unless and until the conviction or sentence is overturned, either on appeal, in a collateral proceeding, or by executive order. *Id*. at 486–87.
>
> It is possible that Plaintiff's excessive force claim may not be barred by *Heck*, depending on the facts surrounding his arrest. "An excessive-force claim against an officer is not necessarily inconsistent with a conviction for assaulting the officer." *Torres v. Madrid*, 60 F.4th 596, 600 (10th Cir. 2023) (citing *Havens v. Johnson*, 783 F.3d 776, 782 (10th Cir. 2015)). "For example, the claim may be that the officer used too much force to respond to the assault or that the officer used force after the need for force had disappeared." *Id.* "[I]n cases where there are multiple uses of force or a continuing use of force, *Heck* may bar the plaintiff's claims as to some force but not all." *Id*. at 600–01 (citing *Hooks v. Atoki*, 983 F.3d 1193, 1197, 1201 (10th Cir. 2020) (although *Heck* barred plaintiff, who had pleaded no contest to two counts of assault and battery on a police officer, from bringing excessive-force claims based on four uses of force involved in subduing him, "[t]he fifth and sixth uses of force [we]re different" and thus not barred by *Heck* because plaintiff had alleged that he "no longer posed a threat")).

> In *Torres*, the Tenth Circuit reversed the decision finding plaintiff's claims were barred by *Heck* as inconsistent with plaintiff's no-contest pleas to charges of aggravated flight from a law-enforcement officer and assault upon a peace officer "because her pleas are not inconsistent with her claims that the officers used excessive force by firing at her after she had driven past them and no longer posed a threat to them." *Id*. at 599–600. "The analysis of whether *Heck* bars the entirety of a plaintiff's excessive-force claims thus requires 'compar[ing] the plaintiff's allegations to the offense []he committed." *Id*. at 601 (citing *Havens*, 783 F.3d at 782).

(Doc. 4, p. 6-7.)

In this case, Plaintiff alleges that Defendants used excessive force when they arrested him—specifically, during the initial efforts to handcuff him. Plaintiff pled no contest to felony interference with law enforcement based on his obstruction, resistance, or opposition to Deputy Marquez, who initially attempted to handcuff him. Plaintiff also pled no contest to misdemeanor battery on a law enforcement officer for kicking Defendant Ligon during the ensuing struggle. A finding that Defendant Bolmer's repeated but brief uses of the taser in drive stun mode during that struggle was unconstitutional would necessarily implicate the validity of Plaintiff's convictions of interference with law enforcement and misdemeanor battery on a law enforcement officer. Thus, Plaintiff's claim is subject to dismissal.

## IV. Response Required

In light of the Report and for the reasons set out above, the Court is considering dismissal of this matter. Plaintiff will be given the opportunity to respond to the Report and to show good cause why dismissal should not be entered. Failure to respond by the Court's deadline may result in dismissal of this action without further prior notice.

9

**IT IS THEREFORE ORDERED BY THE COURT** that Plaintiff is granted to and including **April 28, 2025**, in which to respond to the *Martinez* Report and to show cause, in writing, why this matter should not be dismissed for the reasons explained in this order.

**IT IS SO ORDERED.**

**Dated March 27, 2025, in Kansas City, Kansas.**

<u>s/ John W. Lungstrum</u>
**JOHN W. LUNGSTRUM**
**UNITED STATES DISTRICT JUDGE**